Anthony Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
AQUA TERRA AERIS LAW GROUP LLP
409 45th Street
Oakland, CA 94609
Phone: 415-326-3173
Email: amb@atalawgroup.com

*Attorneys for Plaintiff*
HUMBOLDT BAYKEEPER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBOLDT BAYKEEPER, a California non-profit association, | Civil Case No.: |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| v. | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |
| ROYAL GOLD, LLC, | |
| Defendant. | |

Humboldt Baykeeper ("Baykeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

I.        **JURISDICTION AND VENUE**

1.       This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.       On August 16, 2016, Baykeeper issued a 60-day notice letter ("Notice Letter") to Royal Gold, LLC. ("Defendant" or "Royal Gold"). The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 2014-0057-DWQ* ("2015 Permit") and the Clean Water Act at their Facility located at 1689 Glendale Dr., in unincorporated Humboldt County, CA 95519 ("Royal Gold Facility"). The Notice Letter informed Defendant of Baykeeper's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.       The Notice Letter was sent to the current owners, site manager, and agent for service of process, as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and to the Executive Officer of the Regional Water Quality Control Board, North Coast Region (after being forwarded by the Central Valley Regional Water Quality Control Board, and received by the North Coast Regional Water Quality Control Board ("Regional Board"), on August 29, 2016), fulfilling the requirements of  Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

4.       More than sixty (60) days have passed since the Notice Letter was served on the Defendant and served on and received by the State and Federal agencies. Baykeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is

1  diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this

2  complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty

3  under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4      5.    Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the

5  CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial

6  district.

7      6.    Plaintiff also seeks relief from Defendant's violations of the procedural and substantive

8  requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

9  ## II.    <u>INTRODUCTION</u>

10      7.    With every rainfall event, hundreds of millions of gallons of polluted rainwater,

11  originating from industrial operations such as the Royal Gold Facility, pour into the storm drains and

12  local waterways. The consensus among regulatory agencies and water quality specialists is that storm

13  water pollution accounts for more than half of the total pollution entering marine and river environments

14  each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although

15  pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these

16  waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and

17  invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as

18  aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of

19  nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and

20  recreational significance that the surface waters have for people in the surrounding communities. The

21  public's use of the surface waters exposes many people to toxic metals and other contaminants in storm

22  water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as

23  wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

24      8.    High concentrations of total suspended solids ("TSS") degrade optical water quality by

25  reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to

26  alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey).

27  Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to

28  aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons

("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one whole unit change in standard units ("s.u.") represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.      This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Royal Gold Facility.

11.      Baykeeper specifically alleges that Defendant's discharges of pollutants from Royal Gold Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.      PARTIES

### A.      Humboldt Baykeeper

12.      Humboldt Baykeeper is a non-profit association dedicated to safeguarding coastal resources for the health, enjoyment, and economic strength of the Humboldt Bay community through education, scientific research, and enforcement of laws to fight pollution, with a focus on the Humboldt Bay watershed and coastal waters from Trinidad Head to the Eel River, including the Mad River and Mill (Hall) Creek, into which Royal Gold discharges polluted storm water and non-storm water. Baykeeper's office is located at 1385 8th St #228, Arcata, CA 95521.

13.      Humboldt Baykeeper has over 1000 members who live and/or recreate in and around the Humboldt Bay watershed and coastal waters. Baykeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these

goals, Baykeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

14.     Baykeeper's members use and enjoy the waters near the Royal Gold Facility, including the Mad River and Mill (Hall) Creek, to sail or boat, swim, kayak, windsurf, birdwatch, picnic, fish, hike, conduct scientific study and research, and/or for aesthetic enjoyment.

15.     Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge of polluted storm water and non-storm water from the Royal Gold Facility, negatively impacts and impairs Baykeeper's members' use and enjoyment of these waters.

16.     The interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

17.     Continuing commission of the acts and omissions alleged herein will irreparably harm Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.     The Owners and Operators of the Royal Gold Facility**

18.     Baykeeper is informed and believes, and thereon alleges, that Royal Gold, LLC, is a corporation formed under the laws of the State of California. Baykeeper is informed and believes, and thereon alleges, that the registered agent for service of process for Royal Gold, LLC, is Chad Waters, at 4228 Lentell Rd., Eureka, CA 95503.

**IV.     STATUTORY BACKGROUND**

**A.     The Clean Water Act**

19.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

20.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved

NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

21.     Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

22.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

23.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

24.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

25.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

26.     "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

27.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

28.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams

1    that could affect interstate commerce.

2        29.    The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to

3    traditionally navigable waters where the non-navigable water at issue has a significant nexus to the

4    navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v.*

5    *City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

6        30.    A significant nexus is established if the "[receiving waters], either alone or in

7    combination with similarly situated lands in the region, significantly affect the chemical, physical, and

8    biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d

9    at 999-1000.

10       31.    A significant nexus is also established if waters that are tributary to navigable waters

11   have flood control properties, including functions such as the reduction of flow, pollutant trapping, and

12   nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

13       32.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen

14   enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or

15   limitation . . . or an order issued by the Administrator or a State with respect to such a standard or

16   limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

17       33.    Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act,

18   33 U.S.C. § 1362(5).

19       34.    An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C.

20   § 1365(a). xx

21       35.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to

22   $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA. *See* 33 U.S.C. § 1319(d) and

23   1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

24       36.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or

25   substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and

26   consultants' fees.

27       **B.    California's Storm Water Permit**

28       37.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own

EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

38.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

39.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. 2015 Permit, Section XXI(A).

40.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

41.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

42.     On July 1, 2015, the 2015 Permit became effective, and was issued as NPDES No. CAS000001 (the same NPDES permit number as the 1997 Permit). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

43.     To discharge storm water lawfully in California, industrial dischargers must secure

coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 2015 Permit, Section I(A) (Finding 17), Section II(B).

44.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

### C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

45.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 2015 Permit, Discharge Prohibition III(B).

46.     Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

47.     Discharge Prohibition III(C) of the 2015 Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

48.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark

levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System ("NPDES") General Permit for Stormwater Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

49.    The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: pH – 6.0 – 9.0 standard units "s.u."); TSS – 100 mg/L; total organic carbon ("TOC") – 110 mg/L; iron – 1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L; phosphorous ("P") – 2 mg/L; chemical oxygen demand ("COD") – 120 mg/L; and zinc – 0.13 mg/L. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters, except TOC, that generally mirror the Benchmark Values.

50.    The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

51.    Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges from adversely impacting human health or the environment.

52.    Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

53.    Receiving Water Limitation VI(A) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

54.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

55.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

56.     The Water Quality Control Plan for the North Coast Region (Rev. May 2011) ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for the Mad River and Mill (Hall) Creek include: municipal, agricultural supply, industrial service supply, industrial process supply, groundwater recharge, fresh water replenishment, navigation, hydropower generation, commercial and sport fishing, wildlife habitat, cold freshwater habitat, warm and cold spawning, migration, estuarine habitat, rare, threatened or endangered species, and contact and non-contact water recreation. *See* Basin Plan, at Table 2-1.

57.     Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges in violation of the Storm Water Permit. The Basin Plan sets forth, among other things, narrative WQS, for pollutants including: floating material, suspend material, settleable material, oil and grease, biostimulatory substances, sediment, and turbidity. *See* Basin Plan, at 3-2.00 to 3-3.00, and Table 3-1.

58.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

59.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[1]

60.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

61.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation Section VI(A) of the 2015 Permit.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

---

[1] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 2015 Permit, Attachment H at 18.

Complaint for Declaratory and Injunctive Relief     11
and Civil Penalties

62.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-stormwater discharges from the facility. 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-stormwater discharges. 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 2015 Permit, Section I(D) (Finding 32), Section X(C).

63.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit, Section X.

64.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial Facility. 2015 Permit, Section X.

65.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit, Section

X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit, Section XV.

66.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

**E.     The Storm Water Permit's Monitoring and Reporting Requirements**

67.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit, Section XI.

68.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

69.     Section XI(A)(4) of the 2015 Permit requires that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

70.     Section XI(A) of the 2015 Permit requires dischargers to conduct monthly visual observations of storm water discharges.

71.     Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 2015 Permit, Section X(B)(1).

72.   The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 2015 Permit Section XI(B)(4).

73.   Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

74.   Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

75.   Section XI(B)(6) of the 2015 Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

76.   Table 1 of the 2015 Permit requires Facility under SIC code 2875, such as the Royal Gold Facility, to analyze storm water samples for iron, N+N, lead, zinc, and phosphorous.

77.   Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.   STATEMENT OF FACTS

### A.   Facility Site Description

78.   Royal Gold's industrial Facility is located at 1689 Glendale Drive, in the unincorporated community of Glendale, CA 95519. The Facility currently consists of approximately 15.5 acres comprising a potting soil mixing operation, with upon information and belief, expansion plans to include a total collection of parcels of approximately 28.55 acres with greatly expanded industrial operations.

The entire site sits at an elevation of less than 100 feet above sea level. A former mill site, industrial debris such as broken equipment, metal chunks, and other trash are thought to litter the parts of the site. The site contains large compost areas, a sediment basin and separate sediment trap, ponds and other water features, numerous uncovered stockpile areas, a bagging area, water tanks, detention basins, raw materials receiving, mixing and storage areas, finished product loading areas, boneyards, and parking and other areas. Heavy equipment on site includes large front loader tractors used to move and mix soil, and an industrial mixer with loader bucket. The industrial activities of the Facility fall under Standard Industrial Classification ("SIC") Code 2875, Fertilizers, Mixing Only.

79.     Royal Gold discharges storm water associated with industrial activities pursuant to the General Permit through at least three discharge areas, where streams exit the site. Streams exit the site from at least four locations on the site, but one of these locations, Discharge Point 3 is alleged to comingle with adjacent property run-on, and has been excluded from sampling. The active sampling sites for these discharge locations are identified in the SWPPP as Discharge Point 1, Discharge Point 2, and Discharge Point 4. Discharge Points 1 & 2 are on the western side of the Facility, while Discharge Point 4 is on the eastern portion of the Facility. Upon information and belief, polluted non-storm water drains through a culvert on the southwest portion of the Facility near to Discharge Point 1 & 2. These discharges enter the Mad River and Mill (Hall) Creek, which is a tributary to the Mad River. The Mad River and Mill (Hall) Creek are waters of the United States within the meaning of the CWA.

**B.     The Royal Gold Facility Storm Water Permit Coverage**

80.     The Royal Gold Facility Owners and/or Operators submitted a NOI on or about August 11, 2015 ("NOI"), for coverage under the 2015 Permit.

81.     The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification ("WDID") number as 1-12I025790.

82.     SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

83.     The NOI identifies the receiving water for runoff from the Royal Gold Facility to be Mill Creek.

84.     Via search of the SMARTS database, Baykeeper obtained a SWPPP for the Facility dated

Complaint for Declaratory and Injunctive Relief     15
and Civil Penalties

July, 2015 ("Royal Gold SWPPP").

85.     Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility's SWPPP fails to describe and/or adequately describe all of the Royal Gold Facility industrial activities or processes.

86.     Baykeeper is informed and believes, and thereon alleges, that because the Royal Gold Facility's SWPPP fails to describe and/or adequately describe all of the Royal Gold Facility's industrial activities, the Royal Gold Facility's SWPPP also fails to describe and/or adequately describe all of the significant materials and processes that are related to the Royal Gold Facility's industrial activities.

87.     Baykeeper is informed and believes, and thereon alleges, that pollutants associated with the Royal Gold Facility include, but are not limited to: pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); BOD; TSS; benzene; pesticides; gasoline and diesel fuels; TKN; dioxins, trash; fugitive and other dust and dirt; and O&G.

88.     Baykeeper is informed and believes, and thereon alleges, that other pollutants such as pentachlorophenol ("PCP"), tetrachlorophenol ("TCP"), among others, are also associated with, and have been found at, the Royal Gold Facility.

89.     Baykeeper is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at the Facility in the SWPPPs, the Royal Gold Facility Owners and/or Operators have not developed and/or implemented all appropriate BMPs.

90.     Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility's SWPPP includes no assessment and/or no adequate assessment of potential pollutant sources, the associated pollutants, and the corresponding BMPs at the Royal Gold Facility.

91.     Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility's SWPPP includes no description and/or no adequate description of the Facility BMPs, analysis of the effectiveness of the BMPs, or a summary of the BMPs by pollutant source.

92.     Baykeeper is informed and believes, and thereupon alleges, that Royal Gold Owners and/or Operators have failed and continue to fail to develop the Royal Gold Facility's SWPPP and site-specific BMPs consistent with Section X of the 2015 Permit.

93.     Baykeeper is informed and believes, and thereon alleges, that Defendant's SWPPP fails and continues to fail to include an adequate: (1) list of significant materials handled and stored at the site; (2) description of potential pollutant sources including industrial processes, material handling and stockpiling areas, dust and particulate generating activities; (3) description of significant spills and leaks; or (4) list of all non-storm water discharges and their sources; Section X of the 2015 Permit.

94.     Baykeeper is informed and believes, and thereon alleges, that storm water sampling at the Royal Gold Facility demonstrate that the Royal Gold Facility's storm water discharges contain concentrations of pollutants above the Benchmark Levels, including but not limited to zinc, iron, TSS, N+N, P, and COD.

95.     Baykeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Royal Gold Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Royal Gold Facility.

96.     Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners and/or Operators have failed and continue to fail to adequately revise the SWPPP, despite repeated and significant concentrations of pollutants in the Royal Gold Facility's storm water discharges, make changes to the Royal Gold Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

97.     Baykeeper is informed and believes, and thereon alleges, that some of the Royal Gold Facility's industrial operations are conducted outdoors without secondary containment or other measures to prevent polluted storm water from discharging from the Royal Gold Facility.

98.     Baykeeper is informed and believes, and thereon alleges, that some of the Royal Gold Facility's industrial operations are conducted outdoors without secondary containment or other measures to prevent polluted non-storm water from discharging from the Royal Gold Facility.

99.     Baykeeper is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Royal Gold Facility's operations areas and offsite.

100.    Baykeeper is informed and believes, and thereon alleges, that these pollutants are deposited into water bodies, and onto streets and/or into storm drains adjacent to the Royal Gold Facility via fugitive dust and other means, including but not limited to dust generated by wind, equipment and vehicles.

101.    Baykeeper is informed and believes, and thereon alleges, that trucks and vehicles leaving the Royal Gold Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and grease, pesticides, metal particulates, and other pollutants off-site.

102.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners' and/or Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with their industrial activities to precipitation, and that this results in discharges of polluted storm water from the Royal Gold Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

103.    Baykeeper is informed and believes, and thereon alleges, that BAT/BCT for the Royal Gold Facility is full enclosure of all uncovered bulk material stockpiles, and industrial operations that cause the spread and release of pollutants, and cleanup of any unused, broken, or legacy equipment that litter the site.

104.    Baykeeper is informed and believes, and thereon alleges, that Defendant have failed to achieve compliance with BAT/BCT requirements by failing to fully enclose bulk material stockpiles, industrial operations that cause the spread and release of pollutants, and unused, broken or legacy equipment.

105.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners and/or Operators' failure to properly address these pollutants and their sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from the Royal Gold Facility into Mill (Hall) Creek, which flows to the Mad River.

106.    Baykeeper is informed and believes, and thereon alleges, that Defendant's failure to properly address these pollutants and their sources results in the discharge of fugitive dust, including but not limited to dust generated by industrial operations, wind, equipment, and vehicles, which carries these pollutants to on-site and off-site waterbodies, and to off-site properties, streets and storm drains adjacent

to the Royal Gold Facility. Pollutants deposited into on-site or off-site waterbodies eventually flow into Mill (Hall) Creek; those pollutants deposited on adjacent streets, properties and/or in adjacent storm drains are then discharged with storm water flows into Mill (Hall) Creek and the Mad River.

**C.   Storm Water Discharges at the Royal Gold Facility**

107.   Royal Gold discharges storm water associated with industrial activities pursuant to the General Permit through at least three discharge areas, where streams exit the site. Streams exit the site from at least four locations on the site, but one of these locations, Discharge Point 3 is alleged to comingle with adjacent property run-on, and has been improperly excluded from sampling on that basis.

108.   The active sampling sites for these discharge locations are identified in the SWPPP as Discharge Point 1, Discharge Point 2, and Discharge Point 4. Discharge Points 1 & 2 are on the western side of the Facility, while Discharge Point 4 is on the eastern portion of the Facility. Upon information and belief, polluted non-storm water drains through a culvert on the southwest portion of the Facility near to Discharge Point 1 & 2.

**D.   The Royal Gold Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

109.   Baykeeper is informed and believes, and thereon alleges, that pollutants from the Royal Gold Facility discharge from at least four (4) discharge points to Mill (Hall) Creek and the Mad River.

110.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

111.   Baykeeper is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States, and/or a tributary to a traditionally navigable water.

112.   Baykeeper is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the Royal Gold Facility to the Receiving Waters.

113.   Storm water discharges containing pollutants, including but not limited to, heavy metals

such as zinc and iron adversely affect the aquatic environment.

114.     Samples of storm water discharges collected at the Royal Gold Facility contain pollutants including zinc, iron, TSS, N+N, P, and COD in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, EPA Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

115.     Baykeeper is informed and believes, and thereon alleges, that during and/or after every significant rain event[2] or any other storm water discharge that has occurred at the Royal Gold Facility since August 16, 2011 through the present, Defendant has discharged and continue to discharge storm water from the Royal Gold Facility that contains pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the EPA Benchmarks, CTR, and the WQS.

**E.     Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

116.     Baykeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate M&RP for industrial operations at the Royal Gold Facility that complies with Section XI of the 2015 Permit.

117.     Baykeeper is informed and believes, and thereon alleges, that Defendant failed and continue to fail to revise the M&RP for the Royal Gold Facility as necessary to ensure compliance with Section XI of the 2015 Permit.

118.     Baykeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to analyze storm water samples collected at the Royal Gold Facility for all toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharges, in violation of Section XI(B) of the 2015 Permit.

119.     Baykeeper is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Sections XI(B) and XI(C) of the 2015 Permit.

120.     Baykeeper is informed and believes, and thereon alleges, that Defendant failed and

---

[2] A significant rain event is an event that produces storm water runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

continues to fail to adequately revise the M&RP for the Royal Gold Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections XI(B) and XI(C) of the 2015 Permit.

121.    Baykeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Royal Gold Facility consistently fail to perform visual observations of storm water during QSEs.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

122.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

123.    Baykeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Royal Gold Facility from discharging from the Royal Gold Facility through implementation of BMPs that achieve BAT/BCT.

124.    Baykeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Royal Gold Facility occur every time storm water discharges from the Royal Gold Facility. Defendant's failure to develop and/or implement BMPs that achieves the pollutant discharge reductions attainable via BAT or BCT at the Royal Gold Facility is a violation of the Storm Water Permit and the CWA. *See* 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

125.    The Royal Gold Owners and/or Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Royal Gold Facility.

126.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners' and/or Operators' violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

127.    Each day since at least August 16, 2011 that Royal Gold Facility Owners and/or Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

128.    By committing the acts and omissions alleged above, the Royal Gold Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 16, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

129.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

130.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

131.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

132.    Baykeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Royal Gold Facility occur each time storm water discharges from the Royal Gold Facility.

133.    Baykeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Royal Gold Facility each time storm water discharges from the Royal Gold Facility.

134.    The Royal Gold Facility Owners and/or Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels

of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Royal Gold Facility.

135.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners' and/or Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

136.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

137.    By committing the acts and omissions alleged above, the Royal Gold Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 29, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

138.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

139.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Discharges of Non-Storm Water in Violation
of the Storm Water and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

140.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

141.    Baykeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Royal Gold Facility, in violation of the Storm Water Permit and/or CWA Section 301(a), 33 U.S.C. § 1311(a).

142.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners' and/or Operators' violations of Discharge Prohibitions of the Storm Water Permit are ongoing

1  and continuous.

2  143.   Each and every violation of the Storm Water Permit's Discharge Prohibitions is a

3  separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

4  144.   By committing the acts and omissions alleged above, the Royal Gold Facility Owners

5  and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA

6  occurring from February 29, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33

7  U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

8  145.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

9  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its

10  members, and the citizens of the State of California, for which harm they has no plain, speedy, or

11  adequate remedy at law.

12  146.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

13  controversy exists as to the rights and other legal relations of the Parties.

14  WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

15  **FOURTH CAUSE OF ACTION**
16  **Defendant's Failure to Adequately Develop, Implement, and/or**
    **Revise a Storm Water Pollutant Prevention Plan in Violation of the**
17  **Storm Water Permit and the Clean Water Act.**
    **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

18  147.   Baykeeper incorporates the allegations contained in the above paragraphs as though fully

19  set forth herein.

20  148.   Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility

21  Owners and/or Operators have failed and continue to fail to develop an adequate SWPPP for the Royal

22  Gold Facility, in violation of the Storm Water Permit.

23  149.   Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility

24  Owners and/or Operators have failed and continue to fail to adequately implement a SWPPP for the

25  Royal Gold Facility, in violation of the Storm Water Permit.

26  150.   Baykeeper is informed and believes, and thereon alleges, that Royal Gold Facility

27  Owners and/or Operators have failed and continue to fail to adequately revise a SWPPP for the Royal

28  Gold Facility, in violation of the Storm Water Permit.

151.    The Royal Gold Facility Owners and/or Operators have been in violation of the Storm Water Permit at the Royal Gold Facility every day from August 16, 2011 to the present.

152.    The Royal Gold Facility Owners' and/or Operators' violations of the Storm Water Permit and the CWA at the Royal Gold Facility are ongoing and continuous.

153.    The Royal Gold Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Royal Gold Facility Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Royal Gold Facility.

154.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Royal Gold Facility is a separate and distinct violation of the CWA.

155.    By committing the acts and omissions alleged above, the Royal Gold Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 16, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

156.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

157.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

158.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

159.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners and/or Operators have failed and continue to fail to develop an adequate M&RP for the Royal Gold Facility, in violation of the Storm Water Permit.

160.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners and/or Operators have failed and continue to fail to adequately implement an M&RP for the Royal Gold Facility, in violation of the Storm Water Permit.

161.    Baykeeper is informed and believes, and thereon alleges, that the Royal Gold Facility Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the Royal Gold Facility, in violation of the Storm Water Permit.

162.    The Royal Gold Facility Owners and/or Operators have been in violation of the Storm Water Permit's monitoring requirements at the Royal Gold Facility every day from August 16, 2011 to the present.

163.    The Royal Gold Facility Owners' and/or Operators' violations of their Storm Water Permit's monitoring requirements and the CWA at the Royal Gold Facility are ongoing and continuous.

164.    The Royal Gold Facility Owners and/or Operators will continue to be in violation of Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Royal Gold Facility.

165.    Each and every violation of the Storm Water Permit's M&RP requirements at the Royal Gold Facility is a separate and distinct violation of the CWA.

166.    By committing the acts and omissions alleged above, the Royal Gold Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 16, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

167.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

168.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

169.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for their unlawful discharges of pollutants from the Royal Gold Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent benchmarks, standards, or limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.   A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.   A Court order assessing civil monetary penalties for each violation of the CWA at $37,500 per day per violation for violations occurring since August 16, 2011, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.   Any other relief as this Court may deem appropriate.

Dated: October 31, 2016                          Respectfully submitted,

_____
Anthony M. Barnes
AQUA TERRA AERIS LAW GROUP
Attorneys for Plaintiff
Humboldt Baykeeper