# EXHIBIT A

JASON R. FLANDERS (SBN 238007)
ANTHONY M. BARNES (SBN 199048)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave, Suite 115B
Albany, CA 94706
Telephone: 916-202-3018
Email: jrf@atalawgroup.com

Attorneys for Plaintiff
HUMBOLDT BAYKEEPER

JAMES R. ARNOLD (SBN 56262)
JOHN A. BEARD (SBN 301405)
THE ARNOLD LAW PRACTICE (East Bay Office)
3685 Mt. Diablo Blvd., Suite 331
Lafayette, CA 94549
Telephone: (925) 284-8887
Facsimile: (925) 284-1387
Email:  jarnold@arnoldlp.com
        jbeard@arnoldlp.com

Attorneys for Defendant
ROYAL GOLD, LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBOLDT BAYKEEPER, etc.,<br><br>               Plaintiff,<br><br>v.<br><br><br>ROYAL GOLD, LLC,<br><br>          Defendant. | Case No. 3:16-CV-06285-RS<br><br>**[PROPOSED] CONSENT AGREEMENT (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)** |

The following Consent Agreement is entered into by and between Plaintiff Humboldt Baykeeper ("Plaintiff") and Defendant Royal Gold, LLC ("Defendant"). The entities entering into this Consent Agreement are each an individual "Settling Party" and collectively the "Settling Parties."

**WHEREAS**, Plaintiff is a non-profit association dedicated to safeguarding coastal resources for the health, enjoyment, and economic strength of the Humboldt Bay community with a focus on the Humboldt Bay watershed and coastal waters from Trinidad Head to the Eel River, including the Mad River and Mill (Hall) Creek;

**WHEREAS**, Defendant is a limited liability company, duly organized and existing under the laws of the State of California;

**WHEREAS**, Defendant, as a leasehold tenant, operates a soil mixing facility (SIC Code 2875) at 1689 Glendale Drive in McKinleyville, California ("Facility").

**WHEREAS**, Plaintiff contends that Defendant discharges polluted storm water and non-storm water, and that the discharges enter the Mad River and Mill (Hall) Creek;

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 2014-57-DWQ, issued pursuant to Section 402(p) of the Clean Water Act ("Act"), 33 U.S.C. §1342(p), (hereinafter "General Permit");

**WHEREAS**, on August 11 and 12, 2015, Defendant registered for and received coverage under the General Permit by certifying and submitting its Permit Registration Documents to the State Water Board's database, Storm Water Multiple Application and Report Tracking System ("SMARTS").

**WHEREAS**, on August 16, 2016, Plaintiff served Defendant, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Board ("Regional Board") with a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the CWA, 33 U.S.C. § 1365(a) and (b). The Notice Letter alleged violations of the Clean Water Act and the General Permit;

**WHEREAS**, on October 21, 2016, Plaintiff filed a complaint against Defendant, in the United

States District Court, Northern District of California (Case No. 3:16-cv-06285-RS) alleging ongoing violations of the CWA and the General Permit (hereinafter "Complaint");

**WHEREAS**, Defendant denies all allegations in the Notice Letter and Complaint;

**WHEREAS**, Plaintiff and Defendant have agreed that it is in their mutual interest to enter into a Consent Agreement setting forth terms and conditions appropriate to resolving the allegations set forth in the Complaint without further proceedings and without any admission of liability on the part of the Defendant;

**WHEREAS**, all actions taken by Defendant pursuant to this Consent Agreement shall be made in compliance with all applicable Federal and State laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1. The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A).

2. Venue is appropriate in the Northern District pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is located within this District.

3. The Complaint states claims upon which relief may be granted pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

4. Plaintiff has standing to bring this action.

5. The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Agreement for the life of the Consent Agreement, or as long thereafter as is necessary for the Court to resolve any pending motion to enforce this Consent Agreement.

**I.    AGENCY REVIEW AND TERM OF CONSENT AGREEMENT.**

6. Plaintiff shall submit this Consent Agreement to the United States Department of Justice and the United States Environmental Protection Agency (collectively "Federal Agencies") within three (3) business days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. In the event that the Federal Agencies object to entry of this Consent Agreement, the Settling Parties agree to promptly meet and confer to attempt to resolve the issue(s) raised by the

Federal Agencies.

7.     Within ten (10) calendar days of the Federal Agencies' acceptance of the Settlement Agreement, the Parties shall file with the Court a Stipulation and Order that shall provide that the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) concurrently with the District Court's retention of jurisdiction for the enforcement of this Agreement as provided herein.

8.     The term "Effective Date" as used in this Consent Agreement shall mean the last day for the Federal Agencies to comment on the Consent Agreement, i.e., the forty-fifth (45th) day following the Federal Agencies' receipt of the Consent Agreement, or the date on which the Federal Agencies provide notice that they require no further review, whichever occurs earlier.

9.     This Consent Agreement will terminate two (2) years from the Effective Date.

## II.     COMMITMENTS OF THE SETTLING PARTIES.

### A.     **Storm Water Pollution Control Best Management Practices**.

10.     It is the express purpose of the Parties in entering into this Consent Agreement to further the objectives set forth in the Clean Water Act and to resolve those issues alleged by Plaintiff in its Complaint.  In light of these objectives and as set forth fully below, Defendant agrees, *inter alia*, to comply with the provisions of this Consent Agreement, the requirements of the General Permit, and all applicable provisions of the CWA.

11.     Defendant agrees, to the extent it has not already done so, to take all necessary steps to operate the Facility in compliance with the applicable requirements of the General Permit and the Clean Water Act.  If after the Effective Date the applicable requirements of the General Permit and Clean Water Act should change, Defendant agrees to comply with the then-controlling law.  The Parties agree that this Consent Agreement is not intended to enlarge or increase the obligations imposed on Defendant by law, but is designed to ensure Defendant's compliance with its legal obligations.

12.     On or before September 15, 2017, Defendant shall continue, maintain, and/or complete the implementation, and incorporation into the Facility's Storm Water Pollution Prevention Plan ("SWPPP"), of storm water source control measures/best management practices ("BMPs") at the Facility that are set out below. All references to Drainage Management Areas ("DMAs") and/or

Discharge Points ("DPs") refer to the DMAs and DPs marked on Defendant's December 2016 SWPPP.

    a.    At DMA-1, Defendant shall:

        i.    Pave the roadway that runs between DMA-1 and DMA-2, in the southwest corner of the Facility;[1]

        ii.    Scrape mud off the roadway that runs between DMA-1 and DMA-2, in the southwest corner of the Facility;

        iii.    Sweep and scrub all accumulated particulate matter;

        iv.    Install Filtrexx Envirosoxx for metals and Nutriloxx socks, or other filter media for metals and nutrients, along swale that leads to DP-1;

        v.    Enhance swale functionality by widening, deepening, planting and providing structure;

        vi.    Route roof drainage to tanks for storage and reuse for dust control;

        vii.    Install downspout filters no later than October 15, 2017, to address drainage that cannot be captured if tank capacity is exceeded; and

        viii.    Evaluate the feasibility of constructing a permanent cover for material storage (sawdust, soil amendments) and provide Plaintiff with a written report of its evaluation. Factors include: cost, Humboldt County permitting, and physical feasibility given the area any structure might occupy and the size requirements necessary for Defendant's operations.

    b.    At DMA-2, Defendant shall:

        i.    Install Envirosoxx for metals and Nutriloxx socks, or other filter media for metals and nutrients, along the swale that leads to DP-2;

        ii.    Enhance swale functionality by widening, deepening, planting and providing structure;[2]

---

[1] This was completed on May 8, 2017.

[2] This was completed by April 20, 2017.

iii. Route roof drainage to tanks for storage and reuse for dust control; and

iv. Install downspout filters to address drainage that cannot be captured if tank capacity is exceeded.

c. At DMA-3, Defendant shall:

i. Channel storm water flow by constructing berms or swales, and rock armor, and provide structure to such berms or swales;

ii. Fit swales that lead to DP-3 with fiber rolls, and Envirosoxx for metals or other filter media for metals;

iii. Route roof drainage to tanks for storage and reuse for dust control;

iv. Install downspout filters to address drainage that cannot be captured if tank capacity is exceeded;

v. Evaluate the water flowing from the pipe to the east of the Main Bagging Building and determine if it is the result of a natural spring and provide a written report to Plaintiff of the evaluation.

d. At DMA-4, Defendant shall:

i. Fit outflow from lined pond with Envirosoxx for metals and Nutriloxx socks, or other filter media for metals and nutrients;

ii. Pave area to the south and southwest of the lined pond;

iii. Evaluate the possibility of using new covers or bins and provide Plaintiff with a written report of the evaluation;

iv. Remove and properly dispose of soil pile after Defendant receives results of DTSC review. Defendant shall provide the results of DTSC's analysis to Plaintiff within ten (10) business days after receiving the results from DTSC; and,

v. Remove, reuse, or store and palletize with cover all scrap metal.

e. At DMA-5, Defendant shall:

i. Regularly sweep the pad used by the portable soil amendment screener and install a wattle around to corral particulate matter on pad;

ii. Direct downspouts away from compost accumulations that may occur outside of building, and install downspout filters;

iii. Re-engineer the swale to better control storm water.

f. At DMA-6, Defendant shall:

i. Utilize Envirosoxx for metals or other filter media for metals at the drain inlet.

g. At DMA-7, Defendant shall:

i. Remove, reuse, or store and palletize with cover all scrap metal;

ii. Control run-on from adjacent industrial facility to the east with curbing or a berm;

iii. Place Envirosoxx for metals or other filter media for metals at DP-7;

h. At DMA-8, Defendant shall:

i. Place Envirosoxx for metals, or other filter media for metals, at DP-8:

ii. Cease fugitive discharge through walls or curbing, if possible, or alternatively establish new sampling locations.

i. In addition to the DMA-specific BMPs, Defendant shall:

i. Conduct sweeping of all impermeable surfaces at the Facility at least once per day;

ii. Conduct scrubbing and scraping of mud from all impermeable surfaces at the Facility at least once per day;

iii. Install metal-sorbent downspout filters, or other filter media for metals, on all downspouts where roof drainage is not contained.

iv. Conduct all industrial operations on paved surfaces within two years from the date of Defendant's signature of this Agreement.

v. In the event Defendant plans a future soil disturbance of 10 cubic yards or more, Defendant shall:

1. Provide notice to Plaintiff at least ten (10) business days prior to the time of construction.

2. Reduce sediment transport off the site using Best Management Practices consistent with the General Permit;

3. Stockpile any removed soil in locations away from operations and industrial storm water pathways, completely cover it, and surround it with berms or wattles.

4. Sample the stockpile soils and submit for laboratory analysis for pentachlorophenol and dioxins, and submit the results to DTSC for review and approval/guidance as to the appropriate use or disposal method for such soils.

5. Notify Plaintiff within ten (10) business days after receiving DTSC's response.

6. In accordance with DTSC's guidance, dispose of the stockpile off site, or place on site in locations away from operations and industrial storm water pathways.

**B.** **Storm Water Pollution Prevention Plan (SWPPP) Revisions.**

13. Within thirty (30) days of the Effective Date, Defendant shall revise the Facility's SWPPP to include:

a. All current Best Management Practices (BMPs) developed and implemented at the Facility;

b. All BMP requirements identified and developed pursuant to this Consent Agreement;

c. Specific identification of all individuals responsible for compliance with the General Permit and this Consent Agreement, including specifying which individual(s) is/are responsible for each area of compliance (e.g., John Doe, collecting samples);

d. A detailed site map that includes at a minimum all information required by the General Permit, including accurate identification of: drainage areas; areas of storage; conveyances (i.e., channels and ponds); all sources of pollution (including the portable grinder); and areas of discharge;

e.    Identification of additional sampling site at DMA-8 (if fugitive discharge cannot be eliminated at DMA-8).

f.    A description of each industrial activity, all potential pollutant sources, and each potential pollutant associated with each industrial activity and/or pollutant source; and

g.    Provisions that address all the requirements of the General Permit and this Consent Agreement.

**C.    <u>Storm Water Sampling Revisions</u>.**

14.    <u>Sampling</u>. During the life of this Consent Agreement, Defendant shall collect storm water samples from each storm water sampling location during at least two (2) qualifying storm events per Sampling Period.  (The "Sampling Periods" are July 1 through December 31 and January 1 through June 30.) The Facility's storm water discharge locations shall be identified on the Facility site map which shall be included in the SWPPP.  All sampling shall be conducted in the manner described by the General Permit.

a.    Defendant shall have the samples analyzed for the parameters for which it is required to test pursuant to the General Permit.

b.    Defendant shall request that sample analysis results be reported to it within ten (10) days of laboratory receipt of the sample, or as soon as possible without incurring "rush" charges.

c.    Defendant shall provide Plaintiff with the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report for all samples collected at the Facility, within ten (10) business days of receiving the results.

**D.    <u>Reduction of Pollutants in Discharges</u>.**

15.    <u>Parameter Values</u>. Discharge sample results shall be compared to Table 2 of the General Permit, "Parameter NAL Values, Test Methods, and Reporting Units."

16.    <u>Action Plan for Table 2 Exceedances</u>. If the result(s) from any sampling event indicates an exceedance of an NAL value as specified in Table 2 of the General Permit for the reporting year, Defendant shall submit a plan ("Action Plan") to Plaintiff for reducing the level of the contaminant(s) to the values in Table 2.

17. <u>Action Plan; Review of Action Plan; Meet and Confer</u>. If Defendant is required to prepare an Action Plan, the Action Plan shall consist of a written statement discussing the exceedance(s) and/or Defendant's inability to collect and analyze samples from the requisite storm event(s), the possible cause and/or source of the exceedance(s), and additional measures that will be taken and are designed to address and eliminate future exceedances and/or failures to collect required samples.

Defendant shall provide any Action Plan to Plaintiff not later than July 15 following the conclusion of each reporting year, i.e., July 15, 2018 and July 15, 2019. Such additional measures may include, but are not limited to, (i) further material improvements to the storm water collection and discharge system, (ii) changing the type and frequency of Facility sweeping, (iii) changing the type, extent, or modifying other industrial activities or management practices at the Facility.

Plaintiff shall have twenty (20) days from receipt of Defendant's Action Plan to provide Defendant with comments on the Action Plan. Within fifteen (15) days of Defendant's receipt of Plaintiff's comments on the Action Plan, Defendant shall consider Plaintiff's comments and shall either incorporate them into the Action Plan or, if Defendant declines to accept one or more of Plaintiff's comments, provide Plaintiff with a written explanation of the grounds for rejection. Disputes regarding the adequacy of a particular BMP shall not impact the schedule for implementing any other BMP set forth in the Action Plan.

Such additional measures identified in the Action Plan, as amended, shall be implemented no later than forty-five (45) days, to the extent feasible, after Plaintiff's review of the Action Plan. Within thirty (30) days of implementation, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Plan.

Upon request by either Party, the Parties agree to meet and confer promptly in good faith at a mutually agreed upon time and place (including by telephone, if requested by a Party) regarding the contents and sufficiency of the Action Plan. The Plaintiff may request that the meeting be at the Facility if Plaintiff gives reasonable notice and the meeting is scheduled during Humboldt County's wet season (October-May). If Plaintiff does so request Defendant shall not unreasonably deny said request.

Any disputes as to the adequacy of the Action Plan shall be resolved pursuant to the dispute

resolution provisions of this Consent Agreement set out in Section III below.

18.     Defendant shall contact Plaintiff to request an extension of any deadline set forth in this Consent Agreement, if necessary, to implement any advanced BMPs. Plaintiff's consent to Defendant's requested extension shall not be unreasonably withheld.

### E.     **Visual Observations**.

19.     All visual observations shall be conducted in accordance with the terms of the General Permit and this Consent Agreement. During the life of this Consent Agreement, Defendant shall conduct visual observations at each point where storm water is discharged during each qualifying rain event for which Defendant takes samples pursuant to Paragraph 12.  Defendant shall continue to conduct monthly visual observations as required by the General Permit.  Defendant shall maintain logs of the visual observations as required by the General Permit.

### F.     **Employee Training**.

20.     Within sixty (60) days of the Effective Date, Defendant shall conduct additional employee training in order to familiarize employees at the Facility with the requirements of the General Permit and this Consent Agreement. The training program shall include use of written training materials needed for effective implementation of the training program.  Defendant shall also ensure that there are a sufficient number of employees or qualified contractors assigned to implement the BMPs and conduct other compliance activities required by the General Permit and this Consent Agreement, and that these employees and contractors have been properly trained to perform the required activities.

21.     The training program shall require at least the following:

a.      <u>Non-Storm Water Discharge Training</u>. Defendant shall train employees as to the Storm Water Permit's prohibition of non-storm water discharges, including what identifying non-storm water discharges are, which can result from improper practices that may produce non-storm water discharges at the Facility, and how to detect and prevent them.

b.      <u>BMP Training</u>. Defendant shall train employees on BMP implementation and maintenance to ensure that BMPs are implemented effectively to prevent or minimize the exposure of pollutants to storm water, to prevent or minimize the discharge of contaminated

storm water, and to ensure the proper treatment of storm water at the Facility.

c. Sampling Training. Defendant shall designate an adequate number of employees to ensure the collection of storm water samples from each discharge location as required by this Consent Agreement and/or the General Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure storm water samples are properly collected, stored, and submitted to a certified laboratory.

d. Visual Observation Training. Defendant shall provide training to all individuals performing visual observations at the Facility pursuant to this Consent Agreement and/or the General Permit, including when visual observations are required, the different types of visual observations required, and instruction on proper record keeping under the Storm Water Permit.

22. Training shall be provided on an annual basis, or as otherwise required to ensure compliance with the terms of this Consent Agreement, by a private consultant or a representative of Defendant who is familiar with the requirements of this Consent Agreement and the General Permit. The training shall be repeated as necessary to ensure that employees are familiar with the requirements of this Consent Agreement, the General Permit, and the Facility's SWPPP, as appropriate to the particular employee's job descriptions. Any new employee who is responsible for implementation of any portion of the SWPPP or compliance with other terms of the General Permit or Consent Agreement shall receive training within thirty (30) days after being hired, or before being responsible for compliance with the terms of the General Permit or Consent Agreement.

23. Defendant shall maintain training records to document compliance with Section II.G of this Consent Agreement, and shall make these records available for Plaintiff's upon request by Plaintiff. The Training Program shall be specified in the SWPPP and Defendant shall modify the SWPPP as necessary to reflect the training program required by this Consent Agreement.

G. **Storm Water Pollution Prevention Plan Revisions**.

24. Ongoing Duty to Revise SWPPP. Defendant shall revise the SWPPP if there are any changes in the Facility's operations that may possibly affect the quality of storm water discharges at the Facility, including but not limited to changes to storm water discharge point(s) or changes or additions to the BMPs at the Facility resulting from an Action Plan. Defendant shall submit any revised SWPPP

to Plaintiff for review and comment within ten (10) days of completion. Plaintiff shall provide comments, if any, to Defendant within thirty (30) days of receipt of any revised SWPPP. Within thirty (30) days of receiving comments from Plaintiff, Defendant shall incorporate Plaintiff's comments into any revised SWPPP or shall justify in writing why any comment is not incorporated. Any disputes as to the adequacy of the SWPPP and shall be resolved pursuant to the dispute resolution provisions of this Consent Agreement, set out in Section III below.

   **H.    Compliance Monitoring and Reporting.**

   25.    Site Inspections. Plaintiff and its representatives may conduct two (2) site inspections at the Facility during the life of this Consent Agreement, plus an additional inspection if there is a dispute regarding compliance with the terms of this Consent Agreement. The site inspections shall occur during normal business hours, and Plaintiff shall provide Defendant with three (3) days' notice of an intended inspection. If an inspection is noticed during the Wet Season, Plaintiff will continue to follow the weather forecast, and will confirm the inspection at least twenty-four (24) hours prior to the start of the inspection in an effort to ensure Plaintiff is present during a rain event producing a discharge during the inspection.

   26.    During the site inspection, Plaintiff and/or its representatives shall be allowed access to the Facility's SWPPP and other monitoring records, reports, and sampling data for the Facility. In addition, during the site inspection, Plaintiff and/or its representatives may collect samples of discharges from the Facility. If Plaintiff and/or its representatives collect samples, Defendant shall be given an opportunity to collect a sample at the same location immediately following (or prior to) Plaintiff.

   Results of sampling must be exchanged. Any samples collected by either party shall be submitted to a certified California laboratory for analysis in accordance with the provisions of Section II.C of this Consent Agreement. Copies of the complete laboratory reports shall be provided to the other party within 10 business days of receipt.

   27.    Compliance Monitoring and Oversight. Defendant shall pay seven thousand five hundred ($7,500.00) per year for the life of this Consent Agreement, to fund Plaintiff's costs of monitoring and overseeing Defendant' compliance with this Consent Agreement. Equal payment shall

be made within sixty (60) days after the Effective Date, and three hundred sixty (360) days after the Effective Date. Defendant's check shall be made payable to: "Aqua Terra Aeris, LLP" and shall be delivered by certified mail or overnight delivery to: 828 San Pablo Ave., Ste. 115B, Albany, CA 94706.

28.     <u>Reporting and Documents</u>. During the life of this Consent Agreement, Defendant shall copy Plaintiff on all documents related to storm water quality at the Facility that are submitted to the Regional Board or the State Board, except for information submitted to the Regional Board or State Board pursuant to General Permit II.B.3.d (or similar provision in the event the General Permit is changed). Such reports and documents shall be provided to Plaintiff within ten (10) days of submission to the agencies and/or municipalities. Any correspondence related to Defendant' compliance with the General Permit or storm water quality received by Defendant from the Regional Board or the State Board shall be provided to Plaintiff within ten (10) calendar days of receipt by Defendant.

**J.     <u>Environmental Project, Litigation Fees and Costs, and Stipulated Penalties.</u>**

29.     <u>Environmental Mitigation Project</u>. To remediate environmental harms as alleged in the Complaint, Defendant shall pay a total of Forty Thousand Dollars ($40,000.00) to be used to fund environmental project activities that will benefit the Mad River or Humboldt Bay and its watershed ("the Mitigation Payment"). The Mitigation Payments shall be paid (1) to The Betty Kwan Chinn Homeless Foundation, in the amount of Ten Thousand Dollars ($10,000), for constructing and installing public toilet facilities using concrete in one or more locations that benefit Humboldt Bay, and mailed via certified mail or overnight delivery to: The Betty Kwan Chinn Homeless Foundation, Attention: Dan Price, CEO, at 736 C Street, Eureka, CA 95501 and (2) to the Rose Foundation for Communities and the Environment, in the amount of Thirty Thousand Dollars ($30,000) for projects to benefit the Mad River or Humboldt Bay or its watershed and mailed via certified mail or overnight delivery to the attention of Tim Little, Executive Director, Rose Foundation, at 1970 Broadway, Suite 600, Oakland, California 94612. The Mitigation Payment shall be made within ninety (90) days of the Effective Date, and Defendant shall concurrently provide Plaintiff with a copy of such payment.  No funds from such payment shall be used by Plaintiff.

30.     <u>Plaintiff's Fees and Costs</u>. Defendant shall partially reimburse Plaintiff for its investigation fees and costs, expert/consultant fees and costs, reasonable attorneys' fees, and other costs

incurred as a result of investigating and preparing this lawsuit and negotiating a resolution of this matter, in an amount totaling Ninety-One Thousand Dollars ($91,000.00). Such payment shall be made within thirty (30) days of the Effective Date, payable to: "Aqua Terra Aeris, LLP" and delivered by certified mail or overnight delivery to: 828 San Pablo Ave., Ste. 115B, Albany, CA 94706.

31.     <u>Interest Payments</u>. In the event of late payment of any of the sums due under this Consent Agreement, the Defendant shall pay ten percent (10%) APR interest to Plaintiff, which shall accrue from the first day past the date the payment was due until the date Defendant tenders payment. All such payments shall be made payable to: "Aqua Terra Aeris, LLP" and delivered by certified mail or overnight delivery to: 828 San Pablo Ave., Ste. 115B, Albany, CA 94706.

## III.     <u>DISPUTE RESOLUTION</u>.

32.     This Court shall retain jurisdiction over this matter until the Consent Agreement terminates in accordance with Paragraph 8 for the purposes of implementing and enforcing the terms and conditions of this Consent Agreement, and adjudicating all disputes among the Settling Parties that may arise under the provisions of this Consent Agreement. The Court shall have the power to enforce this Consent Agreement with all available legal and equitable remedies, including contempt.

33.     With the exception of the timelines set forth above for Action Plans, if a dispute under this Agreement arises, or either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer within fourteen (14) days of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least fourteen (14) days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the District Court of California, Northern District, which shall retain jurisdiction over the Action until the Termination Date for the limited purposes of enforcement of the terms of this Agreement. The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provisions.

34.     If the Settling Parties cannot resolve a dispute by the end of informal meet and confer negotiations, the party initiating the dispute resolution provision may invoke formal dispute resolution by filing a motion before the United States District Court for the Northern District of California. The Settling Parties agree not to object to an expedited hearing schedule on the motion if requested by one of the Settling Parties.

## IV.     <u>MUTUAL RELEASE OF LIABILITY</u>.

35.     <u>Plaintiff's Release</u>. Upon the Effective Date of this Consent Agreement, Plaintiff, on its own behalf and on behalf of its current and former officers, directors, employees, and each of their successors and assigns, and its agents, attorneys, and other representatives releases and waives all claims which arise from or pertain to, this action, including all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed, that were asserted in Plaintiff's Complaint, up to the Effective Date, as to Defendant and each of its current and former officers, directors, members, employees, shareholders and each of their predecessors, successors and assigns, and each of their agents, attorneys, and consultants..

36.     <u>Defendant's Release</u>. Upon the Effective Date of this Consent Agreement, Defendant, on its own behalf and on behalf of its current and former officers, directors, employees, members, and each of their successors and assigns, and its agents, attorneys, and other representatives releases Plaintiff (and its current and former officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representatives) from, and waives all claims which arise from or pertain to this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed or which could have been claimed for matters associated with or related to Plaintiff's Complaint up to the Effective Date.

37.     Nothing in this Consent Agreement limits or otherwise affects Plaintiff's right to address or take any position that it deems necessary or appropriate in any formal or informal proceeding before the Regional Board, U.S. EPA, or any other judicial or administrative body on any other matter relating to storm water discharges from the Facility occurring or arising after the Effective Date of the Consent

Agreement.

## V.     <u>MISCELLANEOUS PROVISIONS</u>.

38.     <u>No Admission of Liability</u>. Neither this Consent Agreement, the implementation of additional BMPs, nor any payment pursuant to the Consent Agreement shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Defendant maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

39.     <u>Force Majeure</u>. Force Majeure includes any act of God, war, fire, earthquake, or natural catastrophe; civil disturbance, or terrorism; restraint by court order or public authority or agency; or action or non-action by, or inability to obtain the necessary authorizations or approvals from, any governmental agency. Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay. Any party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the force majeure event and that, by exercise of due diligence, it has been unable to overcome the failure of performance. The Settling Parties shall exercise due diligence to resolve and remove any force majeure event.

40.     <u>Construction</u>. The language in all parts of this Consent Agreement shall be construed according to its plain and ordinary meaning, except as to those terms defined in the General Permit, the Clean Water Act, or specifically herein.

41.     <u>Choice of Law</u>. The laws of the United States shall govern this Consent Agreement.

42.     <u>Severability</u>. In the event that any provision, paragraph, section, or sentence of this Consent Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

43.     <u>Correspondence</u>. All notices required herein or any other correspondence pertaining to this Consent Agreement shall be sent by overnight mail, or via electronic mail, with email confirmation of receipt by the receiving party, to the following individuals:

<u>If to Plaintiff:</u>

Jennifer Kalt, Director

Humboldt Baykeeper
Office: 415 I Street in Arcata
Mail: 600 F Street, Suite 3 #810, Arcata, CA 95521
jkalt@humboldtbaykeeper.org

With copies to:

Jason R. Flanders
Aqua Terra Aeris Law Group
828 San Pablo Avenue, Suite 115B
Albany, CA 94706
jrf@atalawgroup.com

<u>If to Defendant</u>:

Chad Waters, President
Royal Gold, LLC
600 F Street, Suite 3 #603
Arcata, CA 95521
info@royalgoldcoco.com


With copies to:

James R. Arnold
The Arnold Law Practice (East Bay Office)
3685 Mt. Diablo Blvd., Ste. 331
Lafayette, CA 94549
jarnold@arnoldlp.com

Any change of address or addresses shall be communicated in the manner described above for giving notices. In addition, the Settling Parties may agree to transmit documents electronically or by facsimile.

44.    <u>Effect of Consent Agreement</u>. Except as provided herein, Plaintiff does not, by its consent to this Consent Agreement, warrant or aver in any manner that Defendant' compliance with this Consent Agreement will constitute or result in compliance with any Federal or State law or regulation. Nothing in this Consent Agreement shall be construed to affect or limit in any way the obligation of Defendant to comply with all Federal, State, and local laws and regulations governing any activity required by this Consent Agreement.

45.    <u>Counterparts</u>. This Consent Agreement may be executed in any number of counterparts,

all of which together shall constitute one original document. Telecopy, email of a .pdf signature, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Agreement.

46. <u>Modification of the Consent Agreement</u>. This Consent Agreement, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties.

47. <u>Full Settlement</u>. This Consent Agreement constitutes a full and final settlement of this matter.

48. <u>Integration Clause</u>. This is an integrated Consent Agreement. This Consent Agreement is intended to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes any and all prior oral or written agreements covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Agreement.

49. <u>Authority</u>. The undersigned representatives for Plaintiff and Defendant each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this Consent Agreement.

50. The provisions of this Consent Agreement apply to and bind the Settling Parties, including any successors or assigns. The Settling Parties certify that their undersigned representatives are fully authorized to enter into this Consent Agreement, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

51. The Settling Parties agree to be bound by this Consent Agreement and not to contest its validity in any subsequent proceeding to implement or enforce its terms. By entering into this Consent Agreement, the Defendant does not admit liability for any purpose as to any allegation or matter arising out of this Action.

IN WITNESS WHEREOF, the undersigned have executed this Consent Agreement as of the date first set forth above.

//

//

Dated: June 15, 2017                    HUMBOLDT BAYKEEPER

By: _____
    JENNIFER KALT, its Director,
    for Plaintiff

Dated: _____, 2017              ROYAL GOLD, LLC

By: _____
    CHAD WATERS, its President,
    for Defendant

Dated: _____, 2017       HUMBOLDT BAYKEEPER

By: _____
     JENNIFER KALT, its Director,
     for Plaintiff

Dated: *June 15*, 2017       ROYAL GOLD, LLC

By: *Chad Waters*_____
     CHAD WATERS, its President,
     for Defendant